Eastern District of Kentucky
FILED
AUG 3 1 2006
AT LONDON
LESLIE G WHITMER
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

CIVIL ACTION NO. 05-308-GWU

GREGORY E. WHITE,                                PLAINTIFF,

VS.                   **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,             DEFENDANT.

## INTRODUCTION

The plaintiff appeals an administrative decision to terminate Child's Supplemental Security Income (SSI) originally awarded in 1991. The case is currently before the Court on cross-motions for summary judgment.

## APPLICABLE LAW

A new regulation sets out the steps for terminating childhood disability benefits. That section provides:

> **§416.994a How we will determine whether your disability continues or ends, and whether you are and have been receiving treatment that is medically necessary and available. .**
>
> (a) *Evaluation of continuing disability, in general.* There is a statutory requirement that, if you are eligible for disability benefits as a disabled child, your continued eligibility for such benefits must be reviewed periodically. . . .

1

White

> (b)(1) . . . We will determine whether there has been medical improvement[1] in the impairment(s) you had at the time of our most recent favorable determination or decision. . . . If there has been no medical improvement, we will find that your disability continues, unless one of the exceptions to medical improvement described in paragraph (e) or (f) of this section applies.[2]

---

[1] "Medical improvement" is any decrease in the medical severity of the impairment(s) which was present at the time of the most recent favorable decision that the child was disabled or continued to be disabled. The agency will disregard minor changes in the signs, symptoms, and laboratory findings that obviously do not represent medical improvement and could not result in a finding that the disability has ended. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs, or laboratory findings associated with the impairment(s). Section 416.994a(c). For children, the agency's definitions of the terms symptoms, signs and laboratory findings may include any abnormalities of physical and mental functioning that the agency used in making its most recent favorable decision. Section 416.994a (c)(2).

[2] Two sets of exceptions are found in subsections (e) and (f) of Section 416.994a (e). Subsection "e" examples include: (1) where substantial evidence shows that, based on new or improved diagnostic techniques or evaluations which became generally available after the date of the most recent favorable decision, the impairment(s) is not as disabling as it was considered to be at the time of the most recent favorable decision, and (2) when substantial evidence demonstrates that any prior disability decision was in error (e.g., the evidence in the file was misread, or an adjudicative standard was misapplied, when required and material evidence is missing, or when new substantial evidence that relates to the prior determination or decision refutes the conclusions that were based upon the prior evidence at the time of that determination or decision (e.g., a tumor thought to be malignant was later shown to have actually been benign). Subsection (f) examples include: (1) situations where a prior determination or decision was fraudulently obtained, (2) when the claimant does not cooperate with the agency, as when he or she is asked to give the agency medical or other evidence or to go for a physical or mental examination by a certain date, (3) the agency is not able to find the claimant, or (4) if treatment has been prescribed for the claimant which would be expected to improve the impairment(s) so that it no longer results in marked and severe functional limitations, and the claimant is not following that treatment without good cause.

2

White

(1) . . . If there has been medical improvement, we will consider whether the impairment(s) that we considered at the time of our most recent favorable determination or decision still meets or equals the severity of the listed impairment it met or equaled at that time. In making this decision, we will consider the current severity of the impairment(s) present and documented at the time of our most recent favorable determination or decision, and the same listing section used to make that determination or decision as it was written at that time, even if it has since been revised or removed from the Listing of Impairments. If that impairment(s) does not still meet or equal the severity of that listed impairment, we will proceed to the next step. If that impairment(s) still meets or equals the severity of that listed impairment as it was written at that time, we will find that you are still disabled, unless one of the exceptions to medical improvement described in paragraphs (e) or (f) of this section applies . . . .

(3) . . . If there has been medical improvement in the impairment(s) that we considered at the time of our most recent favorable determination or decision, and if that impairment(s) no longer meets or equals the severity of the listed impairment that it met or equaled at that time, we will consider whether you are disabled under the rules in §§416.924(c) and (d). In determining whether you are currently disabled, we will consider all impairments you now have, including any you did not have at the time of our most recent favorable determination or decision, or that we did not consider at that time. The steps in determining current disability are summarized as follows:

(i) *Do you have a severe impairment or combination of impairment?* If there has been medical improvement in your impairment(s), or if one of the first group of exceptions applies, we will determine whether your current impairment(s) is severe, as defined in §416.924(c). If your impairment(s) is not severe, we will find that your disability has ended. If your impairment(s) is severe, we will then consider whether it meets or medically equals the severity of a listed impairment.

(ii) *Does your impairment(s) meet or medically equal the severity of any impairment listed in Appendix 1 or Subpart P of Part 404 of this chapter?* If your current impairment(s) meets or medically equals the severity of any listed impairment, as described in §§416.925 and 416.926, we will find that your disability continues. If not, we will consider whether it functionally equals the listings.

(iii) *Does your impairment(s) functionally equal the listings?* If your current impairment(s) functionally equals the listings, as described in §416.926a, we will find that your disability continues. If not, we will find that your disability has ended.

3

## DISCUSSION

The administrative law judge (ALJ) noted that White had originally been awarded Child's SSI benefits on the basis of a brain tumor, under Listing of Impairment Section 111.05A. However, he found that there has been no recurrence of the cancer and that the plaintiff had medically improved. (Tr. 103). His impairments on or after March, 2001 were a history of medulloblastoma, an intermittent explosive disorder, a parent-child relational problem, and a borderline to low average intelligence level. (Id.) He was capable of age-appropriate functioning and had no "marked" or "extreme" limitations of function. (Tr. 104-105). Thus, White's disability was found to have ceased as of March, 2001. (Tr. 105).

A review of the records shows that the plaintiff was, indeed, awarded benefits based on his brain tumor. The Disability Determination and Transmittal refers to the "medulloblastoma, posterior fossa" as the primary diagnosis, with no secondary diagnosis listed. (Tr. 126). Hospital and clinic records from 1991, 1992, and 1993 show that the plaintiff, at age five, underwent a craniotomy, whole brain radiation therapy and chemotherapy for the medulloblastoma with metastasis to the spine. (Tr. 230-281, 340). As of October, 1992, there was concern about whether the still-existent drop metastasis had grown or whether the patient had developed hydrocephalus, but the MRI of the head and cervical spine showed no evidence of pathology and the patient was discharged home for follow-up with "Dr. Walsh." (Tr. 230).

4

White

Records from the NeuroOncology Clinic of the University of Kentucky from 1994 to March, 2001 describe the plaintiff as alert and/or pleasant with normal strength, reflex and sensory systems. (Tr. 318-337). There was no evidence of tumor recurrence (Tr. 318, 320, 324) and it was stated that the longer he went without a recurrence, the less likely it would be to occur; even in 1999, at the 8 year mark, a recurrence was felt to be extremely unlikely, although yearly follow-up scans would be necessary for "quite some time to come." (Tr. 324). As of March, 2001, he was felt to be "probably cured", and would not be scheduled for any further treatment, but would be expected back in the next year for another MRI scan. (Tr. 319).

Thus, the original condition had medically improved since the time of the award of benefits, and this conclusion even takes into account the variety of potential residual problems discussed in the records. The plaintiff's mother was concerned because of her son's headaches, but his doctor felt that these symptoms stemmed from causes unrelated to the tumor, such as having a tension headache or situational stress. (Tr. 322-323, 330, 336). Short stature was almost certainly due to his spinal radiation (Tr. 326) and there was apparently a question about whether or not he could take growth hormones without risking a recurrence of the tumor (Tr. 319, 324); little commentary was made about the effect of this on his ability to function by the doctors following up his cancer. The MRI showed some calcification of his basial ganglia, consistent with long-term radiation changes (Tr. 326), but no clear indication of what results this would have produced in terms of functional abilities. It was reported that the patient was "somewhat

5

White

slow" mentally (Tr. 318, 320, 322, 328, 330), but no connection was made between this and the tumor, radiation or surgery.

The question, then, becomes whether his present status would qualify for disability.

Other evidence submitted to the ALJ fails to document what would amount to "marked" or "extreme" limitations of function. His oncologist had frequently remarked that he was living essentially a normal life for his age. (E.g., Tr. 318). His mother initially indicated that he engaged in what appear to the layman to be somewhat typical activities for his age, such as collecting rocks, having a pet, playing video games, and watching TV. (Tr. 162, 171). A seventh grade teacher indicated that he was always respectful and polite (Tr. 209), a "typical student" (Tr. 211) and that he interacted well with his peers and had no problems with self-help skills, but struggled academically (Tr. 210). Consultative Examiner John Gatschenberger diagnosed depression and borderline intellectual functioning and noted a decreased reading ability (Tr. 310), but listed a GAF of 70, consistent with "mild symptoms" as per the Diagnostic and Statistical Manual of Mental Disorders (4th Ed.) (DSM-IV); he listed only "mild" or "some" difficulty in specific areas (Tr. 311). While the plaintiff had earlier (i.e., 1999) been assessed as having a low GAF by a treating source, this was at a time when he was being "picked on" by children at school and had just experienced the loss of his grandmother (Tr. 316); in cognitive behavior therapy in January, 2001, at the same facility, he was described as calm, pleasant, cooperative and attentive (Tr. 313). Progress notes from the treating sources

6

White

indicate the development of certain conditions such as functional hypoglycemia (Tr. 390) and chronic hypothyroidism (Tr. 420), but without an expression of opinion about associated functional restrictions. Consultative Examiner Julie Joseph Fox noted that she had been told that the plaintiff had been given no physical activity restrictions (Tr. 468) and provided, at most "limited but satisfactory" mental restrictions on her activities (Tr. 476-477). Thus, the ALJ was justified in finding that the plaintiff's status as of 2001 did not justify a continued eligibility for benefits.

The decision will be affirmed.[3]

This the ___31___ day of August, 2006.

G. WIX UNTHANK
SENIOR JUDGE

---

[3] The exhibits submitted to the Appeals Council can be evaluated only under sentence six of 42 U.S.C. Section 405(g). On the face of these exhibits, it is apparent that White was newly diagnosed with a number of conditions, such as diabetes, mitral insufficiency, and pulmonary hypertension with treating doctors' expressing their opinions about his functional restrictions. However, these opinions were rendered only in 2005 and the plaintiff has, at a minimum, not addressed why this or similar information was not obtained at an earlier stage of the proceedings.